Appellant by Pamela Davis Forkowski and Claude Sadovsky, Appellee by Jordalyn Sturt. Thank you. Before we get started, I would like to let you know that Justice Lutton is on this case. He will be a fully participating panel member. He has reviewed the briefs and will be taking part in the decision. Ms. Forkowski? Good afternoon. May it please the Court, Counsel. In this case, the trial court entered upon the petitioners by the defendant's petition to reduce or terminate maintenance. The trial court set maintenance at zero. The court failed to consider the appropriate statutory guidelines. The court excluded evidence relevant to those guidelines and altogether abused its discretion and the appellant's entitled to a new trial. In this case, there was a long marriage between the parties. The parties were married for 27 years. Claude, the husband, worked as an emergency room physician. Terry, the wife, she had some education in finance, but she chose to be a homemaker and raise the children and maintain the home. In carrying out these duties, she benefited her husband, Dr. Sadovsky. The parties divorced in 2009. Judge Barron had a trial on the dissolution of marriage. His finding was that Dr. Sadovsky earned an average of $275,000 per year in the years before the divorce. The court first required maintenance in the amount of $8,000 per month. Terry went on to college and received paralegal training. There was a motion to reduce maintenance in April 2011, and that was also heard by Judge Barron. He reduced maintenance to $6,500 per month, totaling $78,000 per year, stating it was anticipated that Terry would get a full-time job. She did get a full-time job as a paralegal in Naperville and now earns around $39,000 a year. Between 2012 and 2014, Dr. Sadovsky worked simultaneously at several hospitals in southern Illinois. He had an S-Corp where his earnings were deposited and went through the S-Corp, and then he received his salary from the S-Corp. So the evidence shows that if you look at his personal, and then he filed personal tax returns. So the S-Corp filed a tax return, and so did he personally. So the court allowed evidence of his personal tax return, which showed that he made $593,000 in 2012, $590,000 in 2013, and $533,000 in 2014. The court refused to consider the gross amount that was put into the S-Corp. He was the only employee of the S-Corp. His earnings went in there. And so the court refused to consider the evidence that the S-Corp's income in 2012 was $680,000, and in 2013, $915,000, and in 2014, $867,000. The court allowed into evidence the fact that the S-Corp made a contribution to retirement funds for Dr. Sadovsky. In 2014, in the amount of $240,000. The court excluded evidence that the S-Corp made a deposit of $240,000 into the retirement funds in 2013, and $60,000 in 2012. So during these three years, there was significant income in Dr. Sadovsky, worked at several hospitals. Then at age 57, after 2014, Dr. Sadovsky decided to retire because of experiencing stress and stress-related symptoms. He testified that he had physical symptoms such as blinking lights, he had anxiety, and he had some stomach issues also. So he decided to retire in 2014, beginning of 2015. He didn't seek any medical care for his physical symptoms. He didn't seek any psychiatric care except for visiting the experts who testified at trial. He refused to consider medication. He did not look into any other kind of work or perhaps cutting his hours at the end of 2014. And then after hearing, Judge Garcia reduced the maintenance to zero. Part of our contention is that the trial court failed to consider the statutory guidelines that he's mandated to consider. Dr. Sadovsky suggests that because this is on a review of maintenance rather than termination or modification of maintenance, that he's not required to review all of the statutory guidelines and consider those in deciding whether or not to set maintenance at zero. But under 510 and 504, under 510, when modifying, terminating, or reviewing maintenance, the court must consider the 504 factors plus the 510 factors. Bloom is a Supreme Court case, and the court there, it was similar to this case, where the order that set the maintenance prior to the hearing issue said that the maintenance was reviewable. And that's like in our case, when Judge Bitteren set the maintenance at 6,500, he said it was reviewable. But as in Bloom, Dr. Sadovsky filed a motion to terminate or modify maintenance, as in this case. And Bloom says that the 504 and 510 factors apply. The trial court did not have discretion to disregard the 504 and 510 factors. The court under 504 was to consider the income and property of each party, the supporting spouse's realistic present and future earning capacity, and the standard of living established during the marriage. Under 510, the court was required to consider the increase or decrease in Dr. Sadovsky's income since the order setting maintenance at 6,500 in April 2011. And he was also required to consider the property acquired and currently owned by each party, and after the judgment. The judge stated that he would consider the 504 and 510 factors only if he found that Dr. Sadovsky retired in bad faith. That's one of the factors under 510. That's an incorrect analysis. The court's supposed to consider all the factors, and it's perfectly clear. The trial court stated that Dr. Sadovsky didn't have an obligation to support after the dissolution of marriage, and that he could give his money to his girlfriend if he wanted to, even while asking to terminate maintenance. That's also an incorrect statement of law. The wife is entitled to maintenance and support after the marriage, and the standard is whether she can live in the standard of living that they enjoyed during the marriage. And so the court needed to consider all of the circumstances and refused to. The court failed to consider the disparity in property owned by each party at the time of the hearing. Based on Terry's financial affidavit, she had about $1.3 million in net assets. She had a $220,000 mortgage, but after taking that into account, her net assets were $1.3 million. At the time of the hearing, according to the affidavit, Claude had net assets of $1.8 million. He also had some interest in three properties in Hawaii. Were those properties considered part of the $1.8 million assets, or were they separate? On his affidavit, he lists the Hawaiian properties, but he doesn't set forth their value. So they're not included in the $1.8 million. And his ownership interest or relationship to those properties was somewhat up in the air. Correct. He testified that he had a 50% interest in each of those properties, that Ms. King owned the other 50%. There was evidence that, at least by the time of the motion to reconsider, that Dr. Sadowsky had gone into Hawaii courts to try to remove Ms. King from the title. I don't want to sidetrack you too much. That helps me. Thank you. All right. Judge Garcia said, this is when the judge refused to hear evidence that Dr. Sadowsky, across examination, that Dr. Sadowsky, in fact, paid the full price for those three properties and just put Ms. King's name on the property. That's when Judge Garcia said he wouldn't allow the cross-examination and Dr. Sadowsky could give his property away to his girlfriend if he wants to. Was anything of the value of the S-courts included in that $1.8 million? $1.8 million includes all of Dr. Sadowsky's holdings at the time of trial. Property holdings now counting the Hawaiian property. By the time of trial, the S-courts had been dissolved. Okay. So not included. Right. Well, as long as we're sidetracking, you know, the petition to terminate was filed in 2014 but decided in 2017. Did the doctor continue to pay $6,500 a month until 2017? He stopped paying in 2014. And just to clarify, the order that Judge Barron entered requiring maintenance of $6,500... That was reviewable in 2012 but it wasn't reviewed in 2012. Correct. If I recall. Correct. So then you're telling me that in 2014 the doctor just stopped paying? Correct. Filed the petition to terminate maintenance and stopped paying in 2014. And Judge Garcia concluded that was proper. One more question. From 2012 to 2014, did the doctor ever miss a payment of $6,500? I don't believe he did. And he was paying $78,000 a year while his S-court was earning $1 million a year. And so he didn't ask to review maintenance and neither did my client. Okay. Thank you. And so this difference of at least... I mean, I'm going to call it $1 million. I think of at least $1 million. And when we evaluated in our brief, we evaluated very conservatively. We're assuming that he only owns half of the interest in those three properties. And we don't know the value of the Hawaiian property. So $1 million is a conservative number. So that existed five years after the divorce. Even though Terry was allocated 58% of the assets and Claude was allocated 42%. So he was able to increase his assets significantly because of the significant sums he earned in 2012 to 2014. And he made those significant IRA deposits. So the court didn't address the fact that Dr. Sadowski had at least $1 million more in assets than Terry did. He didn't consider the disparity in the property. He said that Terry is trying to redistribute the assets awarded at trial and that she expected Claude to dip into his assets while she wasn't willing to dip into her retirement accounts to support herself. The court stated that to compare the financial assets of the parties at this time, at the time of the trial, would amount to redistributing the assets allocated in the judgment by Judge Barron. And so his conclusion that for him to consider all the property being held by both parties at the time of the hearing, that his conclusion that it would be error for him to consider that because it would be revisiting what Judge Barron decided, that is in clear violation of the statutory factors that he's supposed to consider all the financial circumstances, all the property owned by the parties at the time of the hearing. That conclusion in itself warrants a new trial. Two minutes, please. Secondly, the court refused to consider Dr. Sadowski's realistic earning potential and to consider his full earning potential in 2012 to 2014. He refused to admit into evidence the S-Corp returns that showed those significant sums of $900,000 to $800,000 a year, I believe. $600,000 to $900,000. So in doing that, he refused to consider the realistic earning potential by Dr. Sadowski. And under 510, he specifically considered the increase or decrease in Dr. Sadowski's income since the time of the entry of the dissolution of marriage. Again, the trial court expressly refused to consider the evidence that it's supposed to consider under 504 and 510. That in itself is sufficient to warrant a new trial. The court refused to consider the standard of living established in the marriage, even though that's the standard that we're supposed to try to attain when possible, and that's another violation of the, disregarding the guidelines. The court made evidentiary errors, in addition, which would require a new trial. The one I'm going to raise because I don't have much time is that there was a report written by Dr. Pranichek that talked about the employment opportunities available to an emergency room physician who would like to leave the emergency room and take on other, because of stress. And so, Judge Garcia struck entire testimony of Dr. Pranichek because the exhibit used at trial by Dr. Pranichek did not match the exhibit given to counsel prior to trial. It's uncontested that the two exhibits, the two pages, had the exact same opinions, just in different order. The judge found that to be a 213 violation. That's clear error. The substance of the affidavits was identical, they were just in different order. And so there is a situation where Judge Garcia refused to consider reasonable employment opportunities available to Dr. Sadowski. Time. We request a new trial. Thank you. May it please the court and counsel. My name is Gwendolyn Sturk and I represented Dr. Sadowski during the course of the trial, and I think there's some significant points that are missing from what would have occurred at the trial. At the trial, Dr. Sadowski had paid all of his support through the end of 2014. He had filed his motion at that point in time, and he did not pay it going forward to answer the question. From 2015 forward, they had a petition for rule which was also denied. It is not subject to the appeal because the court felt that there had been a proper basis to review and set the maintenance at zero at the time that he was no longer employed and earning any money whatsoever. Let me just follow your train of thought. So in 2014, the doctor stopped paying support? He paid it all the way through the very end of the year. He paid the total year. And he retired in December, I think. Correct. And the petition was filed in November. That's correct. And then for the next three years, he didn't pay anything. That is correct. Okay, thank you. Okay. Without a court ruling. I'm sorry? Without a court ruling on his motion. Well, there had been several, and it's not in the briefs, but if you look back through the history of it, there had been an issue where they tried to set the petition for rule for hearing, and the court believed that he needed to hear. Judge Garcia wanted to hear the petition to modify prior to the petition for rule because he felt that that had been filed first in time and was not going to hear or address it and would award very clearly retroactive amount of maintenance if he found that the maintenance obligation should continue subsequent to that date. So that occurred before the hearing? In setting, just on temporary, when the court was setting the priority of what order he was going to hear the motions in. The petition for rule to show cause was not filed until well after Dr. Sadowski had filed his motion with regard to the review of the maintenance. So what was the basis for not paying the maintenance if there had been some ruling on the motion? He was no longer employed. He was making zero dollars at that point in time. And the bulk of his estate was in retirement assets, and he had a pending petition before the court. But the contempt allegations or that petition for rule is not subject to any portion of the appeal. So the issue is when Judge Garcia rules, he rules retroactive to the end of December 2014 when the maintenance stopped. Is it the same that Judge Barron stepped out of the case into retirement? Judge Barron had retired, and Judge Barron's cases then went to Judge Garcia. That is correct, yes. So at the time that the evidence was heard before the court, Collette had been an emergency room doctor. He had indicated to the court and had explained to the court that he was suffering from stress, that he had suffered from physician burnout. He had brought in his own expert, which is not outlined in any of the counsel's brief. He had an expert come in, Dr. Clower, who testified about emergency room physicians and the burnout that they experienced and what Dr. Sadowski had been experiencing. The evidence heard showed that Dr. Sadowski had not only the physician burnout, he had the stress, but he had had eight malpractice cases, and that that had caused him great significant stress over the course of his practice. The thing that was very significant in terms of what he did prior to the termination, which was a voluntary termination, which is difficult to overcome because there had to be a finding of good faith. And at that time, he had testified very clearly and in detail as to four mistakes he had made, medical mistakes, which endangered individuals between July and November of 2014. Dr. Sadowski also indicated and testified that it would be a violation of his Hippocratic Oath if he continued to work, given the mistakes that he had made, specifically those mistakes in 2014 as all the other symptoms that he had been experiencing. The Hippocratic Oath said do no harm. One of the portions of the testimony of Ms. Sadowski's or Ms. Brown's expert, Dr. Franczak, in answering a question with regard to would you hire an individual who indicated to you that he could not work because it would be a violation of the Hippocratic Oath given the mistakes that he was making, and the answer was no, he could not hire him under those situations. Dr. Sadowski had also suffered from low patient satisfaction surveys, and they had been down significantly in the area of like 10%. Physically, Dr. Sadowski testified that he suffered from stress, anxiety, he had extensive abdominal issues, diarrhea, he was seeing flashing lights, he had a feeling of impending doom, and that this had a direct reaction when he would be in a situation with a patient in the room, and he would suffer from this type of incident, and as a result, he felt that he couldn't continue and that upon retirement, his symptoms were relieved. Also, Dr. Sadowski did call his treating physician, Dr. Lee, and Dr. Lee indicated and confirmed and diagnosed him with general anxiety disorder. At that time, in addition to that, Dr. Sadowski did indicate to the court what he had taken, the steps he had taken to try to make sure that this was rectified to see if there was something that could be done. He had talked about taking time off, taking travel, doing changes in his rhythmic pattern, which he explained in detail. Just for a moment, I don't think the issue on appeal is whether he retired in good faith. What we're looking at is did the judge consider the right factors when terminating maintenance. So I just want to bring you back to the center a little bit. Very well, and I'll go back to the center because I think that Judge Garcia did because he indicated, and what's important is that he didn't say that he wasn't going to look at the other factors. He said very clearly, Judge Garcia, in the record, page 1499, he says he has to look at everything, but first he had to figure out whether he left his job in good faith. And while they're quoting the Blum v. Koster case, that case says that even if we use that analysis on 510A51, any change in the employment status of either party and whether that change has been made in good faith. So he addressed it. He said, I'm first going to look at that factor, but he didn't say he wasn't going to look at the other factors. And, in fact, he did look at the other factors. He looked at the other factors because he indicated, as portion of the judgment had been entered, that the judgment awarded rehabilitative maintenance only, not permanent maintenance. The judgment also indicated a disproportionate allocation of the share of the marital estate. And in awarding that disproportionate share of the estate, there were two elements that the court talked about, that is Judge Barron. He said that there were going to be balance of the equities in the case, but also he was giving Ms. Brown adequate retirement funds for when she retires because Judge Barron anticipated and stated that at that time it was not a permanent maintenance case. Judge Barron then lowered the case even before Ms. Brown started working and lowered her maintenance from $8,000 a month to $6,500 a month. Ms. Brown starts working and then continues to work, and neither one of them could have filed a motion to review the support in 2012, but neither of them did so. So Ms. Brown could have also asked for a review during this period of time. But now we get to the point that Dr. Sadowski continues to pay the maintenance until he gets to a factor, which is that factor, the major factor, is I can no longer work. And I think that that finding is in good faith, and I agree that there's not a large issue in the appeal here because that is the factor. So when we get to, okay, he retired in good faith, we're then going to look at what are the assets of the parties. Counsel states that there was no comparison or no looking at what the factors were or what the assets were. That's not true. There was a financial disclosure of both parties. The financial disclosure set forth what the income, what the expenses of the parties were, and what their assets were at the time. It listed the three Hawaii properties out, and it listed at that time what is the current, and that's what the case law also says, is that you have to look at what is the current belongings of the current assets of the parties. The court did that. The court also knew, because it reviewed the judgment, what assets were awarded to both parties at the time of the entry of judgment for dissolution of marriage. Yes, Dr. Sadowski had accumulated additional assets, but when he barred testimony of, for example, a corporate return coming in, that corporate return, in his opinion, was no longer relevant, nor was it relevant when we get into 2017 because the corporation had been dissolved since the end of 2014. The corporation didn't exist. There had been no income since 2015, 16, and 17. The court knew. The court weighed the equities and found, and a reasonable person could find it and did not have used his discretion to say, she was awarded 58% of the assets at the time of the entry of judgment. He now is living off the assets because the record also says, and he was taking money off of an annuity. He had been awarded at the time of the entry of judgment for dissolution of marriage, and then he got some income off of managing real estate, but it was very little, and he made a fraction of the income she makes that are $39,000 when we get to trial in 2017. So the point in time that Judge Garcia had to look at is the point in time of the trial when he's making a decision. What are the assets of the parties at that point in time? What is the income at that time? That is all in evidence. What Judge Garcia barred from putting into evidence is, for example, questions like, what are you going to do? Did you travel on this date back in this year while you were paying maintenance, while you were current on maintenance, while there was no motion to modify the maintenance? And then the judge would not allow questions to go forward as to the entire history of the evolution at that point in time because Judge Garcia believed, and he did, he had current information about what the assets were as of the date of the hearing. He had current information, or he had information from the judgment. What were the assets at the time of the entry of the trial and at the time of the entry of judgment for disillusion of marriage? So he didn't have to have the information in between. He considered those equities. He first made the determination. I believe he determined whether or not it was a good faith first because that's his priority. If there's no good faith modification of his employment, he would have taken the income and he would have imputed the income to him. But he got past that threshold and then looked at the other items and used his discretion, and in using his discretion, he found that there was ample assets from which both parties could sustain themselves. Ms. Brown has income coming in going forward. Dr. Sadowski is already living off of his retirement by the time we get to the trial date because he is not employed. To illustrate good faith and the reason why it was set at zero is Dr. Sadowski volunteered that to the judge and said, I am indicating to you that I'm not trying to, I'm telling you I'm not going back to work. This isn't a case where I'm not hearing good faith to say I can't work. If anybody returns to work and if there's a change, then somebody could file another motion to modify maintenance in the future. But at this point in time, maintenance should be the zero amount. And I believe that that was the correct and the appropriate ruling by Judge Garcia within that structure. And I think that you do have to say that Judge Garcia says he has to look at everything. He didn't want to reallocate what had been done. But this isn't dissipation post-decree. What happened, and if you look at the record and look at the questions where he's sustaining the objections to questions about what he did with money, is during the time period while he is current on his maintenance, there's no motion pending to modify it by Ms. Brown, and he's spending his money or he's gaining money and he's putting it here or there, what he does with it that's not a dissipation during that time frame. When we go to review maintenance, the appropriate and the reasonable perspective for the court to take is what's the financial affidavit to date? What was the financial affidavit at that time? And is there enough money for Ms. Brown to sustain herself? He found that there was, and that's not unreasonable. But sustained herself in the quality that she should expect after a 27-year marriage. And if we compare her lifestyle to his lifestyle, just five years after the divorce, were they the same? Well, actually, I would argue that Dr. Sadowski's lifestyle had been reduced substantially because the financial affidavits illustrate that he spent very little money and had limited and modified his lifestyle substantially to live within the amount of money that he was taking. She was still putting expenses, which the court does address, that's saying that they're speculative expenses, they're not current expenses that you have, they're hopes or desires, but they were not her actual expenses. So did the court consider what the style of each of them living in at the point in time of the entry of the new order? The answer is yes. She was still in the home. She was still able to sustain that home. She was in the same home and the same style as he had before. He was in a lesser style because he had reduced his income and had reduced his expenses, and that's what's reflected in the financial affidavits. Did they own the free Hawaiian homes during the course of the marriage? No, they did not. They did not. Did he not live in any of those free homes? He lived in one of the units, and he did testify as to the value of that unit, and then Judge Garcia sustained the objections with regard to whether or not he put someone else on the title of those homes, saying that what he does with his money subsequent to the entry of judgment, whether he had somebody, is not the issue here. So was it ever admitted into evidence who's living in the other two units? It was never asked, respectfully. The only one was there as he revealed that he was living in one of the units. He revealed that the other two units had some rental income that had a negative number, and that's all reflected in the financial disclosure statement. So it is not that this evidence was not available to Judge Garcia because he relied on the affidavits, which now we all know are the required statement from both parties to be able to present this information to the court. That is the form of our statewide forms in order to do that. So to say that somehow the decision on that basis of Judge Garcia was arbitrary or unreasonable, it's not true. He considered all of it. He felt that she had 1.6. She had not paid off her mortgage, so if you take that off, it's like 1.4 in assets. He had 1.8. He had accumulated. He was using those assets. He then had the interest in the Hawaii. What if the 1.6 in her assets were devoted to the retirement funds that Judge Barron made sure she had? Well, Judge, I don't recall the percentage, Your Honor, but what I will tell you is unusual, being a divorce practitioner for now 30 years, was coming in post-decree, is that Judge Barron ever divided retirement benefits 58-42.  The norm is that retirement is generally 50-50, anticipating that it would go forward. But Judge Barron specifically said that he was giving her the additional allotment so that it would prepare her for her retirement and what she would be able to earn during the course of her retirement post-decree. That's why I don't think that the decision here by Judge Garcia in any way was arbitrary. I thought that it was thought out. I thought that he looked at what the assets were and that he knew that Dr. Sadowski at this point in time, based upon his testimony about what his condition was, what Dr. Lee testified to, what his expert testified to, that he could not again ever, and he testified to this, I can never practice medicine again. It would be a violation of my Hippocratic Oath. One minute, please. My symptoms decreased, but then we go forward. Now going to Dr. Franczak. Dr. Franczak's report was different. It was different in context. It was the report submitted and that Judge Garcia barred the report because it was different. I asked Dr. Franczak, every paragraph going through, is it different? His answer was yes. But Judge Garcia didn't just make a generic argument there because Dr. Franczak's report was based upon data that was supplied by Ms. Brown, and Ms. Brown had put together charts and he was relying on them. If you look at Judge Garcia's statement when he barred the report, he said, even if I didn't bar the report, the report was of no value to me or the conclusions were of no value to me because they were based upon items that were not in evidence, accumulated self-made calculations done by Ms. Brown upon which Dr. Franczak was basing his opinion. Dr. Franczak never interviewed Dr. Sadowski, never had any independent report, and Judge Garcia sustained the objections on the basis that Dr. Franczak was in no way a vocational assessment and never had any findings with regard to that. I would also ask that it was also barred in terms of some of his comments because he only was making casual connections, and we cite the case law for that in our brief, Judge, so we feel, Your Honors, and we feel that it was appropriate that Judge did so and he explains the value and then the reason why. Even if he didn't strike it, it would not have been of value. It would not have changed his position. The overall conclusion is it's not arbitrary abuse. We don't even need to speculate whether or not Judge Garcia considered the disparity in property between the parties because he specifically said that for me to do that, to consider the disparity in property between the parties at this time in 2017 would be redistributing the property that Judge Barron already distributed. We know that that's contrary to the statutory factors. The court is to look at the, to compare the assets of the parties, including real estate, which can be used as a means of paying maintenance. That's what the Anderson court says. The court erred as a matter of law in saying that he didn't need to look at the disparity of properties and that to do so is redistribution of what had been done in 2009. There's no evidence that counsel just said that Terry is able to sustain her home. That's contrary to the evidence. She testified that she does not have assets to maintain her home. She testified that she needs a new refrigerator and other work on her home. The trial court sustained an objection when Terry Brown was asked, what do you need at your home? And she said, I need painting, windows, I believe, a water heater, and I can't afford it. He, an objection was made that that was non-responsive to the question. Whatever. That it was non-responsive to the question and that it was a narrative. And it's not a narrative to say I need painting, windows, and air conditioning. And the court just really didn't want to consider all the evidence. The court didn't consider that during the marriage, the Sadovskys traveled and went on vacation, had a lavish lifestyle, and Terry testified that her $39,000 does not meet all of her needs, that she has to dip into a savings account to meet her needs. And she doesn't have, she can't go out to dinner, she can't go on vacation, she cannot live the lifestyle that they had. That was the standard the court was to examine, and the court refused to consider either the lifestyle during the marriage or Terry's limitations on her lifestyle. At the time of hearing, Dr. Sadovsky was not working, was retired, living in Hawaii, and Terry was working in Naperville as a paralegal earning $39,000 a year. As Justice Wright said, counsel is focusing on just one factor, and that's whether he retired in good faith. And even if he did retire in good faith, there's evidence that the judge relied upon, but even if he did retire in good faith, the fact that you've retired doesn't create a special status for somebody. There is still an obligation of support to the extent possible. And to set maintenance at zero after the S Court made over $2.5 million from 2012 to 2014, to set it at zero when Judge Barron set it at $78,000 per year is in views of discretion. Terry's assets are mostly retirement and deferred compensation assets. Didn't she testify that she didn't want to use her retirement assets to maintain the home? Yes. Yes, that's correct. That's what she said because she doesn't want to get a penalty on her retirement assets. So there's no question. The only evidence is that she can't repair her home based on what she's own, and she can't get a new car either. So the request for a new trial, based on the fact that the trial court failed to adequately and thoroughly consider the factors set forth in 510 and 504, and one of the errors was when he refused to allow cross-examination regarding whether or not Ms. King contributed to the purchase price of those three Hawaiian properties that occurred after the dissolution of marriage. That's failing to consider the properties owned by Dr. Sadowski and whether he put her on the deed to make it look like he only had 50% rather than 100% of the share of those properties. And so that in itself shows that the court refused to consider the disparity in the properties of the parties. Thank you. Any other questions? Okay. We thank both of you for your arguments this afternoon. We'll take the matter under advisement, and we'll issue a written decision as quickly as possible. Thank you.